```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                  )
     United States of America,      )   File No. 17-CR-210(1)
 4                                  )            (PJS)
              Plaintiff,            )
 5                                  )
     v.                             )   Minneapolis, Minnesota
 6                                  )   March 28, 2019
     Deshawn Michael Mapp,          )   9:00 a.m.
 7                                  )
              Defendant.            )
 8   ------------------------------------------------------------

 9            BEFORE THE HONORABLE PATRICK J. SCHILTZ
               UNITED STATES DISTRICT COURT JUDGE
10                      (REVOCATION HEARING)

11   APPEARANCES
      For the Plaintiff:        U.S. ATTORNEY'S OFFICE
12                              JORDAN SING, AUSA
                                300 S. 4th St., #600
13                              Minneapolis, Minnesota 55415

14    For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                                REYNALDO ALIGADA, PDA
15                              300 S. 4th St., #175
                                Minneapolis, Minnesota 55415
16
     Court Reporter:            DEBRA K. BEAUVAIS, RPR-CRR
17                              300 S. 4th St., #1005
                                Minneapolis, Minnesota 55415
18

19

20

21
          Proceedings recorded by mechanical stenography;
22   transcript produced by computer.

23

24

25
```

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3          THE COURTROOM DEPUTY:  All rise.  United States

4     District Court for the District of Minnesota is now in

5     session, the Honorable Patrick J. Schiltz presiding.

6          THE COURT:  Good morning.  Please be seated.

7          We are here today on the case of United States of

8     America v. Deshawn Michael Mapp.  The case is Criminal No.

9     17-210.

10         If I could have the attorneys make their

11    appearances, please.

12         MR. SING:  Good morning, Your Honor.  Jordan Sing

13    on behalf of the United States.

14         THE COURT:  Good morning, Mr. Sing.

15         MR. ALIGADA:  Good morning, Your Honor.  Reggie

16    Aligada on behalf of Mr. Mapp, who is present in court.

17         THE COURT:  And good morning to both of you.

18         Let me just set the record here.  In 2011,

19    Mr. Mapp pled guilty to distribution of cocaine base.  Judge

20    John Jarvey of the Southern District of Iowa sentenced

21    Mr. Mapp to 160 months' imprisonment followed by eight years

22    of supervised release.

23         Mr. Mapp's sentence was later reduced to 105

24    months.

25         Mr. Mapp was released from custody on June 19th,

1    2017 and his supervised release also began that day.  Also

2    on June 19th, 2017 the conditions of Mr. Mapp's supervised

3    release were read and explained to him.

4          On August 28, 2017 jurisdiction was transferred to

5    this Court.

6          Mr. Mapp has violated the conditions of his

7    supervised release on numerous occasions.  First, on

8    September 14, 2017, after Mr. Mapp was charged with

9    fifth-degree assault, disorderly conduct, and trespass in

10   Hennepin County District Court and after Mr. Mapp failed to

11   report his arrest to his probation officer, I deferred

12   taking any action.

13         Second, on November 14, 2017, after Mr. Mapp

14   tested positive for marijuana, admitted to using alcohol,

15   and appeared to have tampered with his sweat patches, I

16   modified the conditions of Mr. Mapp's release to require him

17   to perform 16 hours of community service.

18         Third, on February 21st, 2018, after Mr. Mapp pled

19   guilty to disorderly conduct in Hennepin County District

20   Court, was charged with careless driving and failure to

21   notify owner of damaged property in Anoka County District

22   Court, used alcohol, missed four scheduled drug tests, and

23   failed to complete the 16 hours of community service that I

24   had ordered, I modified the conditions of Mr. Mapp's release

25   to require him to participate in remote alcohol monitoring

1    for 60 days.

2              And, fourth, on August 8th, 2018, after Mr. Mapp

3    consumed alcohol, missed remote alcohol monitoring tests or

4    submitted late tests more than three dozen times, left this

5    judicial district without the permission of his probation

6    officer, failed to follow his probation officer's

7    instructions to return to this judicial district, drove with

8    a suspended license in violation of Illinois law, associated

9    with a convicted felon without the permission of his

10   probation officer, and was convicted of domestic battery in

11   violation of Illinois law, I revoked his supervised release

12   and sentenced him to time served followed by three years of

13   supervised release.

14              The government now alleges that once again

15   Mr. Mapp has violated the conditions of his supervised

16   release.

17              Mr. Mapp, when I sentenced you on August 8th of

18   last year, I imposed the following conditions of supervised

19   release:  I ordered you to report to your probation officer

20   as the officer instructed you.  I ordered you to permit the

21   probation officer to visit you in your home or elsewhere.  I

22   ordered that you participate in a substance-abuse program as

23   directed by the probation officer.  And I ordered you to

24   participate in a psychological or psychiatric counseling or

25   treatment program as approved by the probation officer.

1     The government alleges that you violated these

2     conditions of your supervised release in the following ways:

3     The government alleges that on December 27 of last year, at

4     about 2:00 p.m., you talked to your probation officer by

5     phone and you agreed to meet him at your residence that

6     evening at 6:00 p.m.  When the probation officer showed up

7     at your residence at 6:00 p.m., you were not there.  Over

8     the next month, your probation officer attempted to contact

9     you and set up a place and time to meet.  Your probation

10    officer attempted to get in touch with you on four different

11    days, once by visiting you at your residence and four times

12    by trying to call you.  Your probation officer left you two

13    different voicemail messages telling you to get in touch

14    with him.  Despite all of this, you never contacted your

15    probation officer.

16         The government also alleges that since your

17    supervised release recommenced on August 8th of 2018, you

18    have failed to attend and complete a substance-abuse

19    treatment program as directed.  On October 26th of last

20    year, you were referred to an outpatient program at CREATE

21    in Minneapolis.  You attended an intake for this program on

22    November 26th, but you never participated in any group

23    sessions and you did not complete the program.  You were

24    unsuccessfully discharged on December 14th of last year.

25         And, finally, the government alleges that since

1    your supervised release recommenced on August 8th of 2018,

2    you failed to attend any individual counseling sessions with

3    a mental-health therapist, Dr. Maki at Avivo in Minneapolis,

4    as instructed by your probation officer.

5            All right.  Mr. Aligada, have you and Mr. Mapp

6    received written notice of these alleged violations?

7            MR. ALIGADA:  We have, Your Honor.

8            THE COURT:  And have you read and discussed that

9    notice?

10           MR. ALIGADA:  Yes, Your Honor.

11           THE COURT:  All right.  Mr. Sing, under the rules

12   Mr. Mapp is entitled to a summary of the evidence that you'd

13   be prepared to present today, if necessary.  Could you

14   briefly summarize that evidence.

15           MR. SING:  Yes, Your Honor.  Your Honor, the

16   government is prepared to call Probation Officer Bradley

17   Rupprecht, who has supervised Mr. Mapp since he was

18   transferred to this jurisdiction.  Mr. Rupprecht would walk

19   through the conditions that were imposed following the last

20   revocation of Mr. Mapp's supervised release, which Mr. Mapp

21   read and reviewed on September 27th of 2018.  And

22   Mr. Rupprecht would then testify as to the three violations

23   that the Court just walked through:  Mr. Mapp's failure to

24   report as instructed to probation with the last successful

25   contact with Mr. Mapp being on December 27th of 2018

1    followed by the numerous attempts to get in touch with

2    Mr. Mapp that were unsuccessful.  Mr. Rupprecht would

3    testify to the substance-abuse treatment program that was

4    prescribed and Mr. Mapp's failure to follow through on that,

5    and his failure to follow through on the psychological and

6    psychiatric testing program.  And Mr. Rupprecht would

7    testify to his personal knowledge and efforts to investigate

8    Mr. Mapp's compliance with all of these conditions.

9              THE COURT:  All right.  Thank you.

10             MR. SING:  Thank you, Your Honor.

11             THE COURT:  Mr. Aligada, could I have you and

12   Mr. Mapp at the podium, please.

13             Mr. Mapp, I know you've been here before, so you

14   probably remember the deal.  I'm going to have to ask you

15   some questions in a minute and you'll have to answer those

16   questions under oath.  So if you will raise your right hand,

17   please.

18             (Defendant administered oath by the Court.)

19   BY THE COURT:

20   Q.  All right.  So, Mr. Mapp -- you can put your hand down.

21   Thank you.  At this point, you can either admit these

22   allegations or you can deny them.  If you admit these

23   allegations, then I will treat them as true.  If you deny

24   the allegations, then the government will have the burden of

25   proving that its allegations are true by what's called a

1    preponderance of the evidence.  In other words, it will be

2    the government's burden to prove that it's more likely than

3    not that what it alleges is true.

4         If you deny the allegations, we'll have a hearing.

5    The government will present evidence against you.  You heard

6    Mr. Sing summarize the evidence he's prepared to present.

7         If we do have that hearing and the government

8    presents evidence, you will have certain rights, including

9    the following:  You'll have the right to introduce evidence

10   on your own behalf -- that is, to introduce evidence that

11   you did not violate any condition of your supervised

12   release.  You'll have the right to be represented by your

13   attorney, Mr. Aligada.  You'll have the right to ask

14   questions of any witness who testifies against you.  And,

15   finally, if I find that the government has proven that you

16   violated the conditions of your supervised release, you'll

17   have a right to make a statement about what the consequences

18   of that violation should be and to present information

19   regarding that issue.

20        Let me ask you first do you understand that you

21   have these rights today?

22   A.  Yes, I do.

23   Q.  Okay.  And do you understand that if you admit any of

24   the allegations against you, you'll be giving up these

25   rights and I will treat that allegation as true?

1    A.  Yes.

2    Q.  Okay.

3            THE COURT:  Mr. Aligada, how do you want to

4    proceed today?

5            MR. ALIGADA:  I reviewed the petition and

6    Mr. Mapp's rights and he intends to admit the violations

7    today, Your Honor.

8    BY THE COURT:

9    Q.  Is that true, Mr. Mapp?

10   A.  Yes, I do.

11   Q.  Just to be clear, do you admit that you failed to report

12   to your probation officer as instructed and you failed to

13   permit him to visit you essentially?

14   A.  Yes, I do.

15   Q.  All right.  And do you admit that you failed to

16   participate in a substance-abuse program except as I've

17   described?  I know you went through an intake as directed by

18   your probation officer.

19   A.  Yes, I do.

20   Q.  And do you admit that you failed to participate in a

21   psychological counseling program as your probation officer

22   had directed you to?

23   A.  Yes, I do.

24           THE COURT:  Okay.  Based on Mr. Mapp's admission

25   of the violations and the description of the evidence, I

1    find that the defendant has violated the conditions of his

2    supervised release by failing to report to his probation

3    officer as instructed and failing to permit the probation

4    officer to visit him, by failing to participate in a

5    substance-abuse program as directed by his probation

6    officer, and by failing to participate in a psychological or

7    psychiatric counseling or treatment program as approved by

8    the probation officer.

9           Having found that Mr. Mapp violated the conditions

10   of his supervised release, I now have to decide whether to

11   revoke his supervised release and, if so, what sentence to

12   impose.

13          If I revoke his supervised release, the guidelines

14   would apply as follows:  The grade of violation is C.  The

15   criminal-history category is VI.  The term of imprisonment

16   is 8 to 14 months.  And the term of supervised release could

17   be up to life.

18          Mr. Sing, does that sound correct to you?

19          MR. SING:  It does, Your Honor.

20          THE COURT:  And Mr. Aligada?

21          MR. ALIGADA:  Yes, Your Honor.

22          THE COURT:  Okay.  Mr. Aligada, let me turn things

23   over to you then and invite you to say whatever you'd like

24   on Mr. Mapp's behalf.

25          MR. ALIGADA:  Thank you, Your Honor.

1          I think the central question, Your Honor, is what

2     to do when supervised release is impacted by not just

3     mental-health issues but severe depression.  That is where

4     Mr. Mapp sits.

5          The Court has read the litany of things that have

6     happened before this, and many of -- before this violation,

7     and many of the violations there were violations of law.

8     Many of those were about leaving the district, things that

9     were volitional and for accountability purposes decisions

10    that he made to either break the law or ignore the Probation

11    Office in a way that impacts trust and impacts the future.

12         I know the Court knows this from the last

13    supervised-release violation petition and hearing:

14    Mr. Mapp's father died approximately a year ago, just over a

15    year ago.  In October of this year, his mother died.  And so

16    his family has struggled with the loss of two parents, and

17    he has struggled with who to lean on in that process.  We

18    all know that he can and should lean on his probation

19    officer.  We all know that he can and he should lean on

20    mental-health professionals that his probation officer

21    connects him with.  But the nature of depression when

22    combined with what the rest of what Mr. Mapp faces in life,

23    when depression impacts decision-making and when you see the

24    track record of exactly what happened here, things began to

25    spiral in October.  And he was released in August, so he was

1        still focusing on re-entry.

2                That said, at least for the substance-abuse

3        condition here, it's not that he chose not to do anything.

4        He attended the intake in October, as the Court noted -- or

5        he did the update in October.  He attended the intake in

6        November.  In December I think the history shows that while

7        he was discharged on December 14th, he showed up not knowing

8        he was discharged for a session on December 18th and for

9        various reasons was not allowed to go back in the program.

10               Things have happened since this petition was filed

11       in January.  He has gotten the Rule 25 update.  That

12       happened just a few days ago.  My understanding from

13       Mr. Mapp is what the assessor recommended was mental-health

14       treatment, given the grief counseling that he has not had.

15       He has seen Dr. Maki in the last week and intends to keep

16       doing that.

17               So one way to view supervised release when it's

18       not a one-size-fits-all proposition is what it takes to get

19       Mr. Mapp's attention to shake him from the symptoms of

20       depression, and I think that has happened.  And the real

21       30,000-foot view of what is going on with him is not just

22       mental-health issues.  And I don't mean to use that as a

23       general term, but true depression is residential

24       instability.  I mean, these violations are about his

25       probation officer not being able to find him.  These

1    violations are about him living on the margins.

2         And so one direct corrective action if the Court

3    chose to attempt to move him into compliance, as opposed to

4    simply punishment to move him into compliance, would be to

5    give him a term of halfway house placement, because then

6    we'd know where he is and he would be able to save money for

7    an apartment of his own.

8         He's been living with a brother-in-law.  He's been

9    relying on family for stability as far as residential

10   housing goes.  And so if the Court chose not to do a one

11   size fits all and punish and chose to focus on having him

12   find a place to stay and a little closer monitoring by the

13   Probation Office, given the track record in this instance of

14   no new crime violations, just living on the margins and

15   falling between the cracks, I think that's appropriate for

16   what's gone on with Mr. Mapp.  The bottom line is it would

17   put him in the position to continue with Dr. Maki if that's

18   the right mental-health course of treatment.

19        If this seems like a request for one more try, it

20   is.  But given his position and given what's happened, it

21   seems to me that that's what supervised release can be used

22   for in this circumstance, as opposed to mere punishment.

23        THE COURT:  It's a request that I would have more

24   sympathy for if we were here on the first or second time

25   instead of what's the fourth time or depends on how you want

1     to count them.  It's hard to ignore the history.  I mean,

2     it's sort of frustrating.

3              As I've said to Mr. Mapp -- I think to Mr. Mapp

4     the last time he was here, he doesn't seem like a bad guy to

5     me.  He has had some grievous losses, the death of both

6     parents, but we just keep coming back.  I just keep getting

7     notifications that we have this string of violations.  It's

8     just hard to know what to do in these cases.

9              MR. ALIGADA:  Understood, Your Honor.

10              THE COURT:  Mr. Mapp, is there anything you wanted

11     to say this morning?

12              THE DEFENDANT:  Yeah.  You know, yeah, I've got

13     some grievous loss.  I lost my mom and dad.  You know, it --

14     you know, that's hard.  It's hard.  It's going to be a

15     struggle.  And that's going to be a constant struggle, and

16     it's going to be a struggle that I'm going to be dealing

17     with for the rest of my life, you know.

18              THE COURT:  We're trying to give you help with

19     that struggle, Mr. Mapp.

20              THE DEFENDANT:  Uh-huh.

21              THE COURT:  We're willing to make mental-health

22     professionals available to you for free so you can get that

23     help.  What's concerning me is you're not getting the help

24     that we're making available to you.  You know what happens

25     when you don't get help is you do things like drive drunk

1    and --

2              THE DEFENDANT:  Spiral.  Yeah, spiral out.

3              THE COURT:  Yeah, right.  And when you spiral out,

4    people get hurt.

5              THE DEFENDANT:  Uh-huh.

6              THE COURT:  And I don't want to wake up some

7    Saturday morning and find you killed some kid in a

8    drunk-driving accident.  I can't just be concerned about

9    you.  I have to be concerned about the people out there who

10   get hurt when you spiral.

11             THE DEFENDANT:  Yeah, but, you know, drugs and

12   stuff is not -- has not been no problem of mine.

13             THE COURT:  Yeah.

14             THE DEFENDANT:  I have not been using no drugs.

15             THE COURT:  Yep.  I give you credit for that.

16             THE DEFENDANT:  I'm doing nothing with none of

17   that.

18             THE COURT:  I'm being sincere in asking you this:

19   So when you get up in the morning, what do you do?  What are

20   you filling your days with?

21             THE DEFENDANT:  I mean, I'm just getting up and --

22   you know, I get up and try to, you know, go to work, try to

23   get, you know, my job, get my life started right and get on

24   the right track.  Go around putting resumés for different

25   jobs or whatever, that's what I -- that's what my day has

1    been like since I had recently got violated here.  That's

2    what my day has been like yesterday, the day before.

3           You know, then I've been going back and forth to

4    the hospital.  I've been having a few little issues with my

5    body, you know.  You know, my body ain't been acting right.

6    I don't know what's been going on, but I've been passing out

7    a couple times.  I passed out a couple times and it -- and

8    it scares me.

9           THE COURT:  Yeah.

10          THE DEFENDANT:  It starts scaring me because I

11   don't know what's going on with me.  I went up to the

12   hospital and they are trying to see what's going on with me.

13   So that's what I've been concerned with right now, trying to

14   see what's really going on with my body.

15          THE COURT:  Yeah.  That could be really serious,

16   so you want to be sure to get that looked at.

17          THE DEFENDANT:  Yeah.

18          THE COURT:  Okay.  Anything more you want to say

19   this morning?

20          THE DEFENDANT:  Yeah.  And, you know, I've got --

21   I've got -- let me see.  How would I word this.  Like, you

22   know, I'm a man, you know.  I try to stand on my own, on my

23   own two, you know.  I accept the help.  I appreciate the

24   help.  I accept the help, but I like -- you know, I've got

25   to get mine started for me and my life and my family, you

1   know what I'm saying.  So I have to get my life started for

2   them and carry on for us, you know.  I can't keep leaning on

3   my sister and them, you know, and my brother and them.  I

4   can't keep just leaning on them, you know.  I've got to do

5   me.

6           THE COURT:  Well, first you need to get help with

7   your mental-health problems and it sounds like your physical

8   problems as well.

9           THE DEFENDANT:  Yes.

10          THE COURT:  So a step at a time.  So don't go from

11  zero to 60.  Go from zero to 10 and then to 20 and then to

12  30.  It's a step-by-step process.

13          All right.  Can I just have you step aside for a

14  moment so I can hear from Mr. Sing.

15          Mr. Sing.

16          MR. SING:  Thank you, Your Honor.

17          The government certainly agrees that if this were

18  the first violation this might be a different conversation,

19  but Mr. Mapp has been on supervision for quite a long time

20  both in this district and in Iowa.  And he has been before

21  Your Honor once before and received a sentence of time

22  served.

23          As far as Mr. Aligada's point of, you know, what's

24  the right answer as far as shaking the tree or getting

25  through to him, the Court has tried to give him chances and

1    give him opportunities.

2            He's been clear and had his terms of supervision

3    read to him multiple times in numerous places and has

4    continued to go out and askew them until he gets brought

5    back into court and has an explanation.

6            I'm certainly not unsympathetic to what's happened

7    in Mr. Mapp's life, but one of the violations here is simply

8    maintaining contact with his probation officer.  That should

9    be step one, is pick up the phone, call.  You're in the real

10   world now.  I had a problem.  This is what's going on.  I

11   need help.  What can I do?  And that didn't happen either.

12           Punishment has a purpose.  Standing in front of a

13   court and saying I understand what the terms of my release

14   are and I'm going to abide by them, there's a purpose to

15   that, too.  And there's a consistent pattern here of not

16   having that happen.

17           So the government would submit that some period of

18   incarceration seems appropriate here.  Whether it's split

19   between time in incarcerative status and time in a halfway

20   house, that might make sense.  But I think some type of

21   punishment seems to fit the bill here.

22           THE COURT:  Okay.  Thank you, Mr. Sing.

23           MR. SING:  Thank you, Your Honor.

24           THE COURT:  Mr. Mapp, let me have you back at the

25   podium if I could, please.  So I think I'm going to have to

1    give you a short term of incarceration.  There's been too

2    many violations over too long of a time.  I think we need to

3    try to get this thing off the track it has been on.

4             After that, I'm going to have you live in a

5    residential re-entry center for a while so you have a stable

6    residence and you've got help right there and that hopefully

7    we can get you on track with mental-health counseling.  And

8    between the jail and the RRC we can get your physical

9    problems looked at as well.

10            And then, you know, I talked to you about this

11   before:  I don't expect you to be perfect right away.  I

12   mean, you've got a long background here.  You have had some

13   really devastating losses in the last year.  What I'm

14   looking for is that you are trying, that you are in there

15   trying.  And when you blow off your probation officer, when

16   you don't return his phone calls, when you tell him you'll

17   meet him at your house at 6:00 and he shows up there and

18   you're nowhere to be found, then you're dropping out.  Then

19   I've got to take measures to kind of reach out and pull you

20   back in.

21            So I don't want you to think you have to be

22   perfect.  You know, I'll have a lot of patience with you as

23   long as you are working with Brad.  But when you start

24   blowing Brad off and you're out there in the wind, that's

25   when I fear waking up some Saturday morning finding out you

1    killed somebody in a drunk-driving accident or something.

2    When you are back out, work with Brad.  All right?  Answer

3    his phone calls.  Meet with him when he asks you to meet

4    with him.  Tell him what you need, tell him what kind of

5    help we can give you, and hopefully we can get you back on

6    track.

7            All right.  It is the judgment of the Court that

8    your term of supervised release is revoked and that you,

9    Deshawn Michael Mapp, are sentenced to prison for a term of

10   six months.

11           On being released from prison, you will be placed

12   on supervised release for a term of two years.  While you

13   are on supervised release, you must comply with the

14   following conditions:

15           On being released from the custody of the Bureau

16   of Prisons, you must reside for a period of up to 120 days

17   in a residential re-entry center as directed by the

18   probation officer, and you must follow all the rules of that

19   facility.

20           You must comply with the mandatory and standard

21   conditions of supervised release described in Section 5D1.3

22   of the version of the United States Sentencing Guidelines

23   that took effect on November 1st, 2018.

24           Third, you must not use alcohol or other

25   intoxicants, whether legal or illegal.  And you must not

1    spend time in establishments whose primary business is the

2    sale of alcoholic beverages.

3            Fourth, you must participate in a program for

4    substance abuse as directed by the probation officer.  That

5    program may include testing, and inpatient or outpatient

6    treatment, counseling or support group.  You must contribute

7    to the cost of this treatment as determined by the Probation

8    Office Co-Payment Program.

9            Fifth, you must participate in a psychological or

10   psychiatric counseling or treatment program as directed by

11   the probation officer.  You must contribute to the cost of

12   such treatment as determined by the Probation Office

13   Co-Payment Program.

14           Sixth, you must not knowingly associate with any

15   member of the Vice Lords gang or any criminal street gang as

16   that term is described in Section 521(a) of Title 18 of the

17   United States Code without the permission of your probation

18   officer.

19           Seventh, you must allow a probation officer or

20   someone designated and supervised by the probation officer

21   to search your person, residence, office, vehicle or any

22   area under your control.  The search must be based on

23   reasonable suspicion of contraband or evidence of a

24   supervision violation, and it must be conducted at a

25   reasonable time and in a reasonable manner.  You must warn

1    any other residents or affected third parties that your

2    residence, office, vehicle, and areas under your control may

3    be subject to searches under the conditions I have just

4    described.

5              And, finally, eighth, if you do not find

6    full-time, lawful employment as deemed appropriate by the

7    probation officer, you may be required to do

8    community-service work for up to 20 hours per week until you

9    become employed.  You may also be required to participate in

10   training, counseling or daily job searching as directed by

11   the probation officer.

12             I direct that the Probation Office furnish to you

13   a written statement of all of the conditions of your

14   supervised release.

15             All right.  Let me ask you to be seated, please,

16   while I describe the reasons for the disposition.

17             In determining what sentence to impose, I have

18   carefully considered the relevant guidelines and policy

19   statements issued by the United States Sentencing

20   Commission.  In doing so, I recognize that the range

21   recommended by the guidelines is advisory.

22             As directed by 18 U.S.C. Section 3583(e), I have

23   also considered the relevant factors described in 18 U.S.C.

24   Section 3583(a), including the nature and circumstances of

25   the offense, the history and characteristics of the

1    defendant, and the need to deter Mr. Mapp and others from

2    committing crimes in the future; to protect the public from

3    Mr. Mapp; to provide Mr. Mapp with needed care, treatment,

4    and training; and to avoid unwarranted disparities between

5    Mr. Mapp's sentence and the sentences of defendants with

6    similar records who have been found guilty of similar

7    conduct.

8         In particular as to the sentence of imprisonment,

9    I have decided to revoke Mr. Mapp's supervised release and

10   sentence him to a six-month term of imprisonment, which is

11   slightly below the bottom of the range recommended by the

12   Sentencing Guidelines.

13        Mr. Mapp has committed really countless violations

14   of the conditions of his supervised release.  Just three

15   months after being released from prison, Mr. Mapp was

16   involved in a fight inside of a Downtown Minneapolis

17   restaurant.  He apparently attempted to hit a member of the

18   wait staff and then, when security intervened, he apparently

19   attempted to hit a security officer.  I deferred action

20   while Mr. Mapp's state-court case for fifth-degree assault,

21   disorderly conduct, and trespass was pending.

22        Then, while the state case was still pending,

23   Mr. Mapp again violated the conditions of his supervised

24   release by consuming alcohol, testing positive for

25   marijuana, and tampering with his sweat patches.

1    Nonetheless, I treated Mr. Mapp leniently and merely

2    required him to perform 16 hours of community service.

3            Less than two months later, Mr. Mapp was in more

4    trouble.  He was charged in Minnesota state court with

5    careless driving and failure to notify owner of damaged

6    property after he allegedly drove a rental vehicle into

7    oncoming traffic, struck a light post, went through a fence,

8    and rolled the vehicle into a tree.  Mr. Mapp fled the

9    scene, but later blood-alcohol tests revealed a .24 alcohol

10   concentration.  Mr. Mapp admitted that, once again, he

11   consumed alcohol in violation of his supervised-release

12   conditions.  Mr. Mapp also missed four different scheduled

13   drug tests; moreover, he had failed to complete the 16 hours

14   of community service I ordered after his last round of

15   supervised-release violations.  Once again, though, I

16   treated Mr. Mapp leniently and ordered him to participate in

17   remote alcohol monitoring for 60 days.

18           About two months later, the probation officer

19   informed me that Mr. Mapp was failing to comply with the

20   rules of his remote alcohol-monitoring program.  Mr. Mapp

21   missed, or was late to submit, dozens of scheduled tests and

22   submitted other tests which tested positive for alcohol.

23   But that was the least of the problems.  Mr. Mapp also

24   traveled outside the judicial district to Illinois without

25   the permission of his probation officer, failed to follow

1    his probation officer's instructions to return to the

2    judicial district, and committed two offenses while in

3    Illinois -- specifically, driving with a suspended license

4    and domestic battery.  While in Illinois Mr. Mapp also

5    associated with a convicted felon without the permission of

6    his probation officer.  I decided to revoke Mr. Mapp's

7    supervision at this point, but -- against my better

8    judgment -- I gave him the benefit of the doubt and

9    sentenced him merely to time served, followed by three years

10   of supervised release.  But I warned Mr. Mapp if his

11   behavior continued on this path, he would not get the

12   benefit of the doubt the next time.

13           This is the next time, and I am not again willing

14   to give Mr. Mapp the benefit of the doubt.  Mr. Mapp is

15   still defying the conditions of his supervised release, not

16   keeping in touch with his probation officer, not following

17   the instructions of his probation officer, and refusing to

18   participate in the treatment programs that he so badly

19   needs.  I understand, as I've said, that Mr. Mapp has dealt

20   with grievous personal losses during his supervised

21   release -- first the loss of his father and then the loss of

22   his mother.  I do not at all minimize the impact of those

23   losses on Mr. Mapp.  But those losses are all the more

24   reason why he should be getting mental-health and

25   substance-abuse treatment as his probation officer directed.

1    And those losses are certainly not an excuse for shutting

2    out his probation officer and defying his probation

3    officer's instructions.

4         I cannot allow Mr. Mapp to continue along this

5    path because, as we described, when he spirals out of

6    control, other people get hurt and he could get hurt

7    himself.  I think he needs a wake-up call.  My hope is that

8    a six-month prison term, followed by some time in an RRC,

9    will help Mr. Mapp to follow the conditions of his

10   supervised release and get his life back on track.

11        As to the term of supervised release, I've imposed

12   a two-year term of supervised release, along with conditions

13   to help Mr. Mapp get the substance-abuse and mental-health

14   treatment he needs and to help his probation officer monitor

15   him closely.

16        Mr. Mapp, you do have the right to appeal your

17   sentence.  If you want to appeal your sentence, you have to

18   file a Notice of Appeal and you have to do so within 14 days

19   after I enter the judgment in your case, which will likely

20   be later today.

21        If you cannot afford to pay the costs of an

22   appeal, you can ask for permission to be excused from paying

23   those costs.  If you make such a request, the Clerk of Court

24   will file a Notice of Appeal on your behalf.

25        Mr. Aligada, what are your thoughts about whether

1    I should have Mr. Mapp taken into custody now or whether he

2    needs some time to report?

3              MR. ALIGADA:  Your Honor, I would request

4    voluntary surrender.  The obvious issues with security

5    classification influence that.  But I do have medical

6    records from Mr. Mapp.  He has gone to several appointments

7    in the last two weeks at both the chiropractor and a regular

8    primary care doctor.  And to have him be allowed to get

9    whatever records he needs to bring with him to the BOP and

10   any follow-up care that they recommend while out of custody

11   I think would be good.  He voluntarily showed up here today

12   knowing that a prison sentence was a possibility.  And,

13   finally, he was just hired on to a job and to make sure that

14   he splits with that employment in a way that might get him

15   the job back when he returns would be --

16             THE COURT:  Okay.  How much time do you think he

17   needs?

18             MR. ALIGADA:  Two weeks, Your Honor.

19             THE COURT:  Okay.  So we'll do that.  So,

20   Mr. Mapp, I'm going to --

21             I'm sorry, Mr. Sing, do you have any objection to

22   that?

23             MR. SING:  No, Your Honor.  Thank you.

24             THE COURT:  So, Mr. Mapp, I'm going to let you

25   continue to be free.  I will have you self-report in a

1    couple weeks.  You have to obey all the rules while you're

2    free.  If I get notice that you've missed a test or haven't

3    returned Mr. Rupprecht's calls or something like that, then

4    I'll send the marshals out and have you taken into custody.

5    I don't want to have to do that.  So I will give you a

6    couple weeks so you have a chance to get your affairs in

7    order.

8              Let me just look at a calendar here.  Okay.  So

9    this is March 28th.  Two weeks from today is the 11th.  So

10   how about on Monday, the 15th?  So, Mr. Mapp, I will order

11   you to report at 10:00 on Monday, April 15th.

12             I doubt he'll have a designation by then.

13             So you should probably report here to the Marshals

14   Office at the courthouse here.  Okay?

15             All right.  Anything more, Mr. Aligada?

16             MR. ALIGADA:  No, Your Honor.

17             THE COURT:  Mr. Sing, anything more?

18             MR. SING:  No, Your Honor.  Thank you.

19             THE COURT:  Thank you.

20             Good luck to you, Mr. Mapp.

21             THE COURTROOM DEPUTY:  All rise.

22             (Court adjourned at 9:38 a.m.)

23                    *      *      *
          I, Debra Beauvais, certify that the foregoing is a
24   correct transcript from the record of proceedings in the
     above-entitled matter.
25             Certified by:  *s/Debra Beauvais*
                              Debra Beauvais, RPR-CRR